At a Court of Oyer and Terminer held at this term, John Rhodes, negro, was indicted and tried for the murder in the first degree, of James Temple, negro, in New Castle hundred, on the 21st day of April preceding, before Comegys, Chief Justice, and Houston and Wales, Associate Judges, Wootten Associate Judge, absent.
On empanelling the jury to try the case when Mr. Samuel G. Holmes, one of them was called to the box to be sworn, Mr. Bird, Attorney for the prisoner waived the right to propound the usual question in such cases to him, whether he had formed and expressed any opinion touching the guilt or innocence of the prisoner in the case.
The dead body of Temple was found on the night of that day lying on the road and causeway leading from *Page 478 
Market street bridge in the city of Wilmington south towards New Castle, with an irregular shaped fracture of the outer table of the skull an inch and a half in length and an inch in breadth, on the left side and near the top of the head, three or four inches above the left ear and a little to the rear of it. The bone was denuded and slightly fractured, but which in the opinion of the medical witness was not necessarily mortal, and with the neck cut from ear to car through the skin, flesh, veins, arteries and windpipe to the vertebræ which were laid bare by the cut, and which was six inches in length and two in depth across the throat which seemed to have been made by several strokes or gashes with a knife; and with also another cut through the lobe of the left ear and along the left jaw six inches in length and a half an inch in depth, and another across the fore and middle fingers of the left hand.
The body was found lying in the middle of the road about thirty yards from the southern end of the causeway with a pool of blood in the middle of the road where it lay, and a piece of slag near it with marks of blood on it; there were tracks in the road about the body with the print of a bloody hand on the top rail of the fence on the western side of the causeway, nearly opposite to the place where, the body lay, but there were no marks or indications in the road of any scuffle or struggle having occurred there.
The State further proved by a negro woman named Lucinda Duckery, that she lived with her parents beyond the southern end of the causeway, and was at that time at service at a restaurant in Wilmington, and was acquainted with both the prisoner and the deceased, that they both visited her father's house, and that her father then worked for the deceased in his business. That he came to the restaurant that morning with some things in a market basket and said her father had told him to get the marketing and to leave it there for her to take out in the evening when she went home, and at the same time he presented her with a bunch of fish. He then left there *Page 479 
and she did not see him again until after he was dead. That John Rhodes, the prisoner, came there that night when she was getting ready to go home, about 9 o'clock she supposed, and walked with her to the outer end of the causeway and the forks of the roads where he bid her good-by, turned back and started towards town, and she went on home. She then proceeded and stated when she first learnt at her home that night between 11 and 12 o'clock, that there was a dead man lying on the causeway, and going with her mother and two other persons to see it, they both recognized it to be the body of James Temple, the deceased. On cross-examination by Mr. Bird she admitted that she and Rhodes, the prisoner, had been intimate and that she had had two children by him, but denied that she was ever married to him, or had ever lived with him as his wife, and stated that she had no conversation with him that night about Temple, except that when they were about, to separate at the end of the causeway, he asked her what she was in such a hurry for, and she told him it was because she wanted to get home, he said to her that she must suppose that Jim Temple was at her house, and must want to see him, to which she replied no, she did not, and that Temple was not at their house.
The father of the preceding witness next testified among other things, that the prisoner and the deceased were not friends, and were always abusing and cursing each other when they met, but he hardly knew what it was about.
The following day a white handled barlow pocket-knife was found in the ditch along the side of the causeway with the blade open and blood upon it, near where the body lay when first discovered in the road, and which was recognized by another witness, a negro woman, as being very much like one of the same kind of knives which the prisoner had lent her the Thursday morning before at her house to pare her corns with, and finding it very keen while using it she said to him "why John, this knife is as sharp as a razor"! He said "yes, and by G__d I keep it so." And soon afterwards handing it back to him *Page 480 
he strapped it on the sole of her slipper, and then said, "I am going to show some d__d dirt with this knife." And about the same time the knife was found, the tracks of a man moving with long strides across the soft surface of the meadow on the western side of the causeway, and obliquely from the line of it towards the city, were also found and followed in that direction till they crossed a deep ditch, by the police officer who had discovered them, and who then returned into the city and proceeded with two other police officers to the residence of the mother of the prisoner, at 310 East Sixth street where they found him and arrested him for killing the deceased; and where they also found a pair of pants, a vest and a shirt which had some marks of blood on them, and were wet, and had the appearance of having been washed. He was committed to the city hall cells to await the coroner's inquest.
A witness, Peter S. Blake, testified that he had known the. prisoner four or five years, and called to see him soon after he had learnt of his arrest and commitment to the cells of the city hall, and proceeded to relate a conversation he then had with him on the subject of the charge on which he had been arrested, after stating that he made no promise or threat whatever to induce him to say what he did to him about it.
Mr. Pennington, Attorney General. The witness was examined in regard to the same matter before the jury on the coroner's inquest when the conversation was fresh in his memory, and as his testimony in regard to it was then reduced to writing by the coroner's clerk, he asked the Court that the witness might be allowed to take the deposition and use it for the purpose of refreshing his memory merely.
Mr. Bird objected.
The Court held that it was not within the letter of the rule governing such applications, and in such a case they *Page 481 
would not extend it, and therefore declined to allow it.
The witness then stated that the prisoner first said to him that he knew nothing about the killing, and he replied that he did not believe he did. He said he could prove that he was in Hedgeville. But when he started away the prisoner called him back and said to him that he had heard that they had got some of his clothes, and say they are wet and muddy, and then said if his mother was there he could give satisfaction on that point, and asked him if he would tell his mother to come up. He asked a policeman if his mother could see him, but he said no, and he then went back and told him he could not see his mother. He said "that's bad"! and he replied "yes, the whole thing was bad." He then said he would like to see his mother to get that thing fixed up, and he then told him the suspicion had fallen on him pretty strong, and seeing that he wanted to say something to him, he went up to his cell door, and said to him, "John, did you do this thing or not." He said "well, I know you, and I will tell you all about it. I did do it, but it was in self-defense." To which he replied that depended on circumstances; and the prisoner then told him that on Sunday two weeks before that night Temple lay in wait for him along the causeway with two brickbats or stones in his hands, but he saw him and ran and got away from him, and that on the Saturday he was killed, he went out with Lucy Duckery on the causeway to the forks of the road, and after he had turned back from there and was coming towards town, he met him going out on the other side of the causeway, and knew who it was as soon as he saw him, and tried to get by without being observed by him, but Temple saw him, and run across the road towards him with his right hand in his inside coat pocket and said to him "you s__n__of__a__b__h! I've got you now, and I'm going to kill you"! At that moment he saw a stone shining in the road, picked it up and struck him on the head with it, and went up to him and found his knife in his hand, and as Temple had tried to take his *Page 482 
life, he thought he had as much right to take his life, and he then said he saw something skining on the ground by the side of Temple, and picking it up, found it was a knife, and without saying then anything further about it, he next said he then went to the ditch and washed his hands, and he believed he said he lost the knife in the ditch, but he was not certain as to his recollection about that. He then said that Temple was alone when he killed him, and that he raised up his hand, but put it down again, and it was after saying that he told him that he Look the knife and cut him, and cut his throat. After Temple was down he said "you've got me now you s__n__of__a__b__h, put it on me;" and that after he was dead he said that he went and washed his hands in the ditch, and then went across the ploughed field west of the causeway to the bank and along the bank to Market street bridge, and from there home.
Peter J. Babcock, the coroner's clerk at the inquest on the body of the deceased, was also examined as a witness and proved that the prisoner made a voluntary statement without threat or inducement before it, which he reduced to writing, but which was not read to him, or signed by the prisoner, nor was he asked to sign it; and the substance of which he then proceeded to state from his recollection of it, and which corresponded with the statement already given in most of the particulars of it, except that he said on the latter occasion that when Temple ran at him across the road on the causeway he had a big stone or brick-bat in each hand, and that he started to run from him, but struck his foot against something, and stooped down and picked up a piece of slag or cinder and struck and knocked him down with it, and then started again to run, but stopped and went back to him, saw something white lying on the ground by the side of him, found it was a knife with the blade open, picked it up and cut him three or four times across the throat with it. Temple said to him, "you've got me now, put it on me, you *Page 483 
s__n__of__a__b__h"! That he then went to the ditch and washed his hands in it, and then across the field to the bank, and round on the bank to Market street bridge, and then home. The piece of slag found near the body, and the knife found in the ditch, and here produced in Court, were then shown to him, and he said the slag looked like the piece he struck him with, and recognized the knife as the knife he cut him with. He also stated that he had on a slouch hat and when he was meeting Temple on the causeway, he pulled it down over his face to prevent him from recognizing him, and he had got nearly by him, when he turned suddenly round towards him and said to him "you s__n__of__a__b__h! you need not try to hide your face. I know you, and I've been lying for you, and now I've got a good chance I'm going to kill you this night. There's no one around here, and I'll fix you," and then run across the causeway towards him, and as he came at him he dropped his arms and ran his hand in his pocket; and then followed what he, the witness, had already repeated. He further said that Lucy had nothing to do with it. No one knew any thing about it but himself. That he did not expect to meet Temple, and had no knife or weapon about him when he met him. That the knife he cut him with he supposed was Temple's, as he found it open by his side where he fell.
It was further proved by the State that the deceased had a five-barreled pistol in his inside coat pocket with some of the barrels charged, and that it was found in it the night he was killed, by Lucinda Duckery and her mother, when they first went to see the body in the road after they had learn't there was a dead body lying in it, and who were the first to recognize it as the body of Temple; and by the testimony of a witness named Thomas Demby that he was standing talking with the prisoner at Front and Market streets two or three weeks before Temple was killed, when he passed by them and said something to him, and after he had passed, Rhodes said to him "that's a d__d ornery son of a b__h, and if I had my way I'd kill *Page 484 
him," but he did not think much of it, as he did not know then that they were on such bad terms.
The evidence for the prisoner was that he and Lucinda Duckery had lived together as husband and wife at her father's, and that she had declared herself to be his wife, until after an improper intimacy had taken place between her and the deceased, who was a married man although he no longer lived with his wife on account of it, and who was not only in the habit of openly declaring his improper attachment to Lucy, but of cursing and abusing and denouncing the prisoner for no other reason than the fact that he had been her recognized husband up to that time, and had frequently threatened to kill him; and that in the month of March preceding, while she and the prisoner were at the house of a friend who lived in Hedgeville, and were in the front room when the deceased came along and looked into the window, and immediately commenced cursing the prisoner, and said to him now that he had found him in Hedgeville, to jump on him, but the prisoner replied that he did not want to jump on him, he then said to the prisoner that he was going to make him, and took a pistol out of his pocket and snapped a cap of it, and then went out in the middle of the street and cursed him and raved a good deal, whilst the prisoner staid in the house and said nothing; but after a while he slipped out at the door into the street and started away, when the deceased came round the corner of the house and again cursed him, and said to him he would shoot him. and after that he, the prisoner, would have to watch him. The witness of this occurrence also stated that the prisoner was a peaceable man, and folks called him a coward because he would not take any little thing up, and the first time she ever heard him and the deceased quarrel was in front of her house, and then there were no blows struck, but they took it out in cursing each other. The bad feeling between them was all about Lucinda, and she never heard them quarrel about any thing else. She had told her that she was Rhode's wife, and she was considered by those who knew them to be his wife. *Page 485 
Another colored woman testified that she had known them both since she was a girl, and one time when she was sitting at a front window she heard persons running on the pavement and looked out and saw Rhodes coining and Temple after him, and just opposite the window Temple stumbled and fell down, and she then saw that he had an open razor in his hand; and that she had often heard him make threats against Rhodes. That on the morning before Temple was killed he came to her house and asked if she had seen Rhodes that morning, and said that every time Rhodes could get a chance he was slipping over to Duckery's to see Lucy, and was always after her money, and he intended to put his light out, "a yaller s__n of a b__h!" She then asked him why he acted in that way and why he didn't go home and stay with his wife who was a nice woman and he said he would lose his life for Lucy, and then pulled a pistol out of his pocket, and said that was his big dog, and that it never lied on him. At the time first referred to by her, Rhodes lived with Lucy as her husband at her mother's in Hedgeville, and after that Rhodes told her he was going away, because Temple deviled him so that he had no peace of his life, and that in March last he went to Philadelphia to stay, but Lucy got her to write a letter to him for her as his wife, as she could not write, and to tell him that she wanted him to come back, which was done in the latter part of that month. The letter was produced and read in evidence, and bore date the 24th of that month. Testimony to the like effect was then given by six or seven other witnesses, and among them one who stated that he knew both of the parties well, and that he was raised with Rhodes at Smyrna in this State, and that he had always been a quiet and peaceable person; and that he knew he had a white-handled barlow knife a good deal like the one there shown him, and then in evidence, for he had several times borrowed it for a few minutes to cut his fiddle strings with, the last time on last Thursday, but the blade of it was rounded, and not sharp at the point like the one *Page 486 
shown him; and that it was not the same knife, though a good deal like it.
Charles Cook was sworn and stated that he worked for Temple at the time he was killed, and was also acquainted with Rhodes. That on the Saturday night he was killed he walked in with Temple from Hedgeville to town along Front street, and that he stopped at the restaurant and tapped on the window for Lucy, but she had left. Temple then asked him if he saw any thing of Rhodes any where abouts; he told him he had eyes as well as he had; well, he said he didn't see him, but he expected to meet him over the bridge that night, and he was prepared for him. He asked him how he was prepared, and he then took his pistol out of his pocket and said there was something that never lied on him. They then walked on to Market street, and Temple there left him and went on over the bridge; and it was then about 9 o'clock at night. It was also proved that the deceased was a very muscular and able-bodied man, and much more so than the prisoner; and in conclusion the counsel for the prisoner proved that he had on that day entered into a contract to work for several months with a carter in Wilmington.
Robinson, Deputy Attorney General, contended that the fact that the prisoner fled from the scene of the homicide by a circuitous route across the meadows, and at first denied any knowledge of it, was not only inconsistent with his statement that the deceased first assailed him and that he killed him in self-defense, but it proved that the act was committed by him with premeditation and express malice aforethought. But even admitting his statement to be true, it could not be otherwise in contemplation of law, or less than murder of the first degree, because it was not necessary for his escape and security from the threatened attack, however imminent and perilous it might have been before that, after he had cracked his scull and knocked him down and left him lying prostrate *Page 487 
and senseless in the road, that he should have stopped and gone back and killed him by cutting his throat with repeated gashes from ear to ear, and until he had cut his head nearly off; for it was that which killed him, as the physicians had testified that the fracture of the skull was not necessarily mortal. And as the stopping and going back and proceeding in that manner to despatch him as he lay senseless on the ground, with the reflection which he says then occurred to him, that as the deceased had tried to take his life, he thought he had as much right to take his life, was wholly unnecessary for his own safety, it not only stripped him of any legal excuse or justification on the ground of self-defense, but it was evidence from his own lips of such coolness and deliberation as would constitute express malice aforethought.
Bird, for the prisoner, on the contrary, contended that it was manifest from all the evidence that his meeting the deceased on the causeway that night was wholly unexpected by the prisoner, for he believed when he turned back at the forks of the roads to come into town, that Temple was then at Duckery's house beyond the point where he turned back; but had he expected to meet or encounter him that night, or premeditated such a thing as lying in wait for him to make an attack on him there, on one so much superior to him in physical strength and power, it was quite as certain that he would not have been without any other weapon or means for it than a piece of slag picked Up on the road, and an ordinary barlow knife in his pocket, if even he had such a knife about him at the time. It was, therefore, evident that their meeting was, at least, entirely unexpected by him. But how was it as to Temple? The testimony of the witness, Charles Cook, would show that he was not so unprepared for such a meeting, either in point of expectation, or in weapons for it, or in determination to make a hostile one of it in case they should meet that night anywhere between Market street bridge and Duckery's house. He must have crossed *Page 488 
the bridge that night on his way out to Duckery's house, not long after Rhodes and Lucy had crossed it, going in that direction, for he and the prisoner met in thirty or thirty-five yards from the forks of the roads where the prisoner turned back, and Temple doubtless knew that they were together and not far ahead of him on the causeway; and as he well knew that the prisoner was not then allowed to enter Duckery's house, he would have to turn back, at least, when he got there, if not before. And if there was any expectation of a meeting, or any lying in wait on the road by the one for the other with malice aforethought, which of them under such circumstances and under all the evidence which the jury had heard in the case, would it be most reasonable to believe was guilty of it? If such was the case, then all the evidence in it would lead irresistibly to the conclusion that Temple was the man, and would confirm the statement of the prisoner as to the manner in which the collision had occurred that night between them. The probabilities were all in favor of it; and if they rejected his account of it, he could not conceive how they could, under all the facts proved, reasonably account for the commencement of it in any other way. And if at such an hour and in such a place he made a sudden rush at him across the road with the declaration that now he was going to kill him, and with his hand in his inside coat pocket where the evidence shows that he had a loaded pistol, and with no power on the part of the prisoner to escape from the threatened bullets of it, had he not the best and strongest reason for believing that his life was in imminent peril, or that he was, at least, in the greatest danger of being instantly shot by him? And if the jury were satisfied that he had good reason for believing so, then it was in law a case of justifiable killing in self-defense, and the prisoner should be entirely acquitted of any offense whatever. Whether the fracture of the skull was, or was not a mortal wound, was not a question to be considered, because it could not now be decided by *Page 489 
the jury, or by the Court, or by anybody else. In all probability it was a fatal wound, and was sufficient of itself to have caused his death, if he was not in fact entirely dead when his throat was cut. But whether that was so or not, if he was justified in law in killing him in self-defense when he struck the blow upon his head and broke his skull, then what he did afterwards by way of despatching him, could not make it murder with express malice aforethought, or with even implied malice, but manslaughter only; for if it was necessary for his own safety and protection for him afterwards to have done that, then it was a case of killing on a sudden, unprovoked and perilous assault made upon him by the deceased, in which the provocation would unquestionably have been sufficient to reduce to the crime of manslaughter at least, if not to a case of justifiable homicide in self-defense.
As to his hasty flight from the scene of it, and his denial at first of all knowledge of it, that might be reasonably and satisfactorily accounted for consistently with his positive allegation from the first moment that he admitted it, that he did it in self-defense, on several grounds. In the first place he was an ignorant man, and had but an imperfect apprehension of the legal consequences of the terrible act which he had just committed, as was manifest from the simple remark which he made in vindication of it, and which was that as Temple had tried to take his life, he thought he had as much right to take his life, without seeming to know that it was because Temple had no right to try to take his life, that he had a right under the circumstances stated by him to take his life. In the next place it was evident that the killing was quickly done, and was as much a work of sudden terror as of bitter vengeance and inflamed passion on the part of the prisoner; and then that he was frightened and appalled at the apprehended consequences of it to himself; that he had killed a man, and if it should become known that he did it, he would have to be hung for it, and if charged with it, that there was no one who could prove him innocent of it. *Page 490 
And as for any discrepancies which appeared in his two statements made at different times and before different witnesses of them, they would be found to be in relation to matters of minor importance, and such as might readily have occurred under such circumstances, but they would be found to be substantially the same in all their essential details. His own firm belief was that the killing had occurred substantially as the prisoner had stated it, without any premeditation, deliberation or design, or any expectation whatever on his part of meeting the deceased on the occasion, until he encountered him on the road and he suddenly rushed at him in the threatening and alarming manner stated by him; and as his honest effort had been to establish the truth of that statement and his assertion that he did the act in self-defense, he had called a number of most respectable witnesses to prove his well-known character for peace and good order, and also a witness to prove that he had that day entered into a contract with him to work for him several months, as he thought it would tend to show that up to that time he could have had no expectation whatever that any such terrible calamity was so soon to befall him.
Pennington, Attorney General. The confession or statements of the prisoner, though put in evidence by the State, were not to be considered for that, or any other reason by the jury, as entitled to credit and belief, except so far as the facts and circumstances satisfactorly proved in the case independent of them, should warrant their belief in the truth of the statement; and the Court would not only so instruct them, but would further inform them that they might believe so much of the confessions as made against the prisoner, and reject or discredit so much of them as made in his favor, except so far as they were sustained by other evidence produced, if after duly considering all the facts proved in the case, they should see proper to do so. But it was neither his duty, nor his inclination to do more than to make such use of them, as all the facts *Page 491 
and circumstances established by the evidence in the case would reasonably and justly warrant. He would admit that without them the State might not have been able to prove in so clear and satisfactory a manner, how the prisoner killed the deceased, although the evidence, independent of the confessions, would have been amply sufficient to sustain the allegations in the indictment as to that matter to the satisfaction of the jury.
Then coming to the facts proved in the case on behalf of the State, which were but few, the first he would call their attention to was that the eyesight of the deceased was impaired and imperfect, and was inferior to that of the prisoner, and as the prisoner must from his own statement have recognized the deceased before the deceased recognized him, as they were approaching each other at that hour of the night on the causeway, why did not the prisoner at once turn aside from it, or even turn back upon it, as soon as he saw and recognized him, if he was afraid of him, or was anxious to shun or avoid meeting him, particularly at such an hour and in such a place so far removed from any human habitation? The next fact proved to which he would call their attention was that the deceased was struck with the piece of slag or cinder on the left side of the head three to four inches above the ear and a little to the rear of the ear, and with so much force as to fracture the outer table of the scull an inch and a half in length; and looking at that fact he would ask how it could have been done, if the prisoner either threw it at him, or struck him with it in his hand, while he was rushing towards him across the road, or while he was standing facing him after he had started to run from him, struck his foot against it, suddenly snatched it up from the ground and wheeled round in time to strike him with it as he came at him, and fell him to the earth before he had time to get his pistol from his inside coat pocket, although according to his statement his hand was in his pocket before he had found the slag unexpectedly at that remarkably opportune moment for him. He thought he *Page 492 
could safely say that neither by a throw of it, nor by a blow of it in his hand, would it have been possible for him while facing the deceased to have dealt him a blow with it on that part of his head with sufficient force to fracture the skull of such a stout and robust negro man; for standing in such a position and facing each other, the blow in either case must have struck that portion of the head at such an angle as would have much impaired and weakened the force and effect of it. Besides the fracture itself, and the depression of the fragments of bone produced by the blow, clearly served to show that it must have impinged directly upon that portion of the skull, and when the left side of the body and head of the deceased was turned directly towards the face of the prisoner, and must have been thrown with great force directly against that side of his head and while he was in the act of passing the prisoner unseen on that side of him. The proof was that there were gate-posts on the side of the road, and his own belief was that the prisoner had taken his position by one of them when he discovered the deceased approaching, and wholly unobserved by him gave him the fell blow with the piece of slag on the side of his head just as he was in the act of passing him in that unobserved position. He was probably expecting, the moment the blow was delivered, to have to make a run for it to get out of the way of both his wrath and his pistol, and may have started at that instant, but finding the success of his aim and the effect of his blow much more signal than he probably expected, he at once perceived that the time and opportunity had come for glutting his vengeance in the life-blood of his prostrate body as it lay on the ground, and before it could recover from the effect of that blow, and he then proceeded deliberately to cut his throat in the effectual and ferocious manner stated by him, and as described in. the testimony which the jury had heard. And with this correction made in them, there was probably not much error or falsehood contained in the statements of the prisoner in regard to the *Page 493 
matter, although there were some material inconsistencies in the invention of the two which showed the inherent fallacy of both of them in the account which he had attempted to give of it.
And to the question, what prompted him to kill the deceased under those circumstances and in such a blood-thirsty manner, there could be but one answer, and that was malice, express malice beyond the possibility of a doubt. The prisoner had never been married to Lucinda Duckery; that had been clearly proved. But if he had been, his jealousy of the deceased, however well-founded could have constituted no excuse or justification, or extenuation even, of the killing of him under such circumstances; for nothing short of the killing of a man in the act of adultery with a lawfully wedded wife by the husband, can reduce it below the crime of murder to the offense of manslaughter; nor could any threats, however frequent or violent made by the deceased to shoot or kill him, furnish any excuse or justification for it in law. In no event could it be considered a case of either self-defense or manslaughter, or of even murder of the second degree, and he should therefore be convicted in manner and form as he stood indicted.
The duty we are now engaged in is the most important that devolves upon society as an organized body, that of deciding whether a state of things has arisen that justifies it in sending one of its members to his long account. The passage of laws for the government of men's conduct in the ordinary concerns of life, however important such affair may appear to be, is one of the functions of civilization so familiar, and of such frequent exercise, as to occasion no notice of an extraordinary kind; but when that attribute of society which has concern with the question of the right of one of its members longer to live, or rather with its duty to protect itself against him as its foe, is to be exercised, then the attention of every one is *Page 494 
aroused; for human life is so precious, and so sacred, that all feel it is not to be taken away, or rendered entirely useless by imprisonment for life, without the most urgent necessity, and upon satisfactory proof. Society, the body politic of Delaware, is now, through its appointed tribunal for the decision of a question so awful, acting in such a case. This Court, and you gentlemen, are assembled, with John Rhodes, the prisoner at the bar before you, to decide whether or not his life is forfeited to the criminal laws of this State, and though the important duty is cast upon the Court of deciding, and instructing you what the law is, by which you are to be governed in making your decision, so far as the law itself is an element thereof, yet it is with you, and with you only, to pronounce upon the guilt of the prisoner and the grade of it, or whether he is in fact guilty at all. This is a most responsible duty, gentlemen, to be performed by you, as we feel sure it will be, under a high sense of its obligations, and according to the dictates of an enlightened conscience. We know that you will allow yourselves to be influenced by no considerations of vindictiveness or false humanity; but that you will say, without hesitation, that the prisoner is guilty, or innocent, as you find the fact to be.
It is proper gentlemen that you should be fully informed of the law of homicide or manslaying, before you enter upon the duty of determining what your judgment shall be upon the facts; so that you may apply that law to the facts, and ascertain what is the grade of the offense that has been committed by the prisoner, if in fact, he has committed any legal offense at all.
And it is proper, also, gentlemen, that we should say to you, that you have nothing to do with the consequences of a verdict against the prisoner; they fall upon society, and your responsibility is to discharge yourselves of the issues in this case honestly and truly according to the evidence.
All homicides, that is, all acts of killing men, are of three kinds, and three only in law; first, justifiable; second, excusable; third, felonious. *Page 495 
1. Justifiable homicides are such and such only as are committed, first without any will, intention, or desire, or any inadvertence or negligence in the party killing, and therefore without blame; such as by sheriff executing sentence of death by hanging a criminal in strict conformity to law in every particular; or secondly, for the advancement of public justice, as where an officer, in the due execution of his office, kills a person who assaults and resists him, or where a private person, or officer, attempts to arrest a man charged with felony and is resisted, and in the endeavor to take him, kills him, or if a felon flee from justice, and in the pursuit be killed, when he cannot otherwise be taken, or if there be a riot or a rebellious assembly, and the officers or their assistants, in dispersing the mob, kill some of them, where the riot cannot otherwise be suppressed, or if prisoners in jail, or going to jail, assault, or resist the officers, while in the necessary discharge of their duty, and the officers, or their aids, in repelling force by force, kill the party resisting; or thirdly, for the prevention of an atrocious crime attempted to be committed by force, such as murder, robbery, housebreaking in the night time, rape, mayhem, or any other felony against the person. But in such cases the attempt must be not merely suspected, but apparent; the danger must be imminent, and the opposing force or resistance necessary to arrest the danger, or defeat the attempt.
2. Excusable homicide is that which is committed, either first by misadventure, which is where one doing a lawful act unfortunately kills another; as if he be at work with a hatchet and the head flies off and kills a bystander; or if a parent is correcting his child, or a master his apprentice, or scholar, the bounds of moderation not being exceeded either in the manner, the instrument or the quantity of punishment; or if an officer in punishing a criminal, within the like bounds of moderation or within the limits of the law, and in either of these cases, death ensues; or thirdly, in self-defense, which is where one is *Page 496 
assaulted, upon a sudden affray, and in the defense of his person where certain and immediate suffering would be the consequence of waiting for the assistance of the law, and there was no other probable means of escape, he kills the assailant. To reduce homicide in self-defense to this degree, it must be shown that the slayer was closely pressed by the other party, and that he in good faith and with the honest intent to avoid the violence of the assault retreated as far as he conveniently or safely could.
The jury must be satisfied from the proof that, unless he had killed his assailant he was in imminent and manifest danger either of losing his own life, or of suffering enormous bodily harm. This latter kind of homicide is sometimes called chance-medley and closely borders on manslaughter. In both cases it is supposed that passion has kindled on both sides and that blows have passed between the parties; but the difference lies in this, that in manslaughter it must appear either that the parties were actually in mutual combat when the mortal stroke was given, or that the slayer was not at that time in imminent danger of death; but that in homicide excusable by self-defense it must appear either that the slayer had not begun to fight, or that, having begun, he endeavored to decline any further struggle, and afterwards being closely pressed by his antagonist he killed him to avoid his own self-destruction. There are other kinds of excusable homicide, but as this case cannot be classed, under any circumstances, with either of them, it is not important we should further refer to them.
3. Felonious homicide, which is of two kinds, namely, manslaughter and murder, the difference between which consists chiefly in this, that in murder there is the ingredient of malice, while in manslaughter there is none. Manslaughter, when voluntary, arises from the sudden heat of the passions, murder from the wickedness of the heart; and it is of two kinds, voluntary and involuntary, but it is of the former, or voluntary manslaughter only, that in this case we are called upon to speak. It is defined *Page 497 
to be where one kills another in heat of blood; and this usually arises from fighting, or provocation. In the case of fighting, in order to reduce the crime from murder to manslaughter, it must be shown that the fighting was not preconcerted, and that there was not sufficient time for the passion to subside, for in the case of a deliberate fight, such as a duel, the slayer and his second are murderers. So much with respect, to manslaughter; though we may add that although there was not time for passion to subside, yet if the case be attended with such circumstances as indicate malice in the slayer, he will be guilty of murder. Thus, if the slayer provide himself with a deadly weapon beforehand in anticipation of the fight, and not for mere defense of his person against a felonious assault; or if he take an undue advantage of the other in a fight; or if, though he were in the heat of passion, he should designedly select out of several weapons equally at hand, that which alone is deadly, it is murder.
Murder, which is the other kind of felonious homicide, is when a person, of sound memory and discretion, unlawfully kills any reasonable creature living under the peace of the State, with malice aforethought, either express or implied. In this State, there are two degrees of such crime of murder, that is, murder in the first, and murder in the second degree. Our statute upon that subject says: "Every person who shall commit the crime of murder with express malice aforethought, or in perpetraing or attempting to perpetrate any crime punishable with death, shall be deemed guilty of murder of the first degree, and of felony, and shall suffer death. Every person who shall commit the crime of murder otherwise than is set forth" above, "shall be deemed guilty of murder of the second degree."
Having thus read the definition from the statute of murder in the first degree, it is proper, as you are allowed in cases of indictment for murder, to find the prisoner guilty of murder in the first or second degree, or of manslaughter, that we should inform you what is murder in *Page 498 
the second degree. Murder in the second degree is where the malice (necessary in any case to make up the crime of murder) is an inference or conclusion of law upon the facts found by the jury; and among these the actual intention of the prisoner becomes an important fact; for though he may not have intended to take away life, or to do any personal harm, yet he may have been engaged in the perpetration of some other felonious or unlawful act, from which the law raises the presumption of malice. Thus if one attempts to kill or maim A, and in the attempt, by accident, kills B, his dearest or darling child; or if one, in the attemption to procure abortion, causes the death of the mother; or if in a riot or fight, one of the parties accidentally kills a third person who interfered to part the contestants and preserve the peace, the law implies malice, and the slayer is guilty of murder. And though other agents intervene between the original felonious act and its consummation, as if A gives poisoned food to B intending that he should eat it and die, and B, ignorant of the poison, and against the will and entreaty of A, gives it to a child, who dies thereby, or is voluntarily tasted by an innocent third person, by way of convincing others of his belief that it is not poisoned, as in the case of an apothecary into whose medicine, prepared by him for a sick person, another had purposely mingled poison, the law implies malice, and holds the wrong-doer guilty of murder. These are the familiar examples of implied malice given in the books of authority, and illustrate what is meant by our law when it provides that all cases of murder, other than with express malice aforethought, shall be murder in the second degree. These arc cases of such murders.
It is not disputed that the prisoner at the bar slew James Temple, for he has confessed it more than once; but it is his plea for such act that he was acting in self-defence. Was he, or not, so acting? That is a question fraught, to him, with the most momentous consequences, and you alone are to settle it. When does the law allow *Page 499 
one man to kill another in self-defense? The definition we have already given to you, determines that. It is where one is assaulted upon a sudden affray; and in the defense of his person, where certain and immediate suffering would be the consequence of waiting for the assistance of the law, and there is no other probable means of escape, he kills the assailant. But to reduce homicide to this degree, it must be shown that the slayer was closely pressed by the other party, and retreated as far as he conveniently could, in good faith, with the honest intent to avoid the violence of the assault. The jury must be satisfied that, unless he had killed his assailant, he was in imminent and manifest danger, either of losing his own life, or of suffering enormous bodily harm. With this exposition of the law of self-defense, you are to determine whether, or not, it was necessary in the case you are trying, that the prisoner at the bar should take the life of James Temple, either to save his own life, or avoid receiving enormous bodily harm. The fact that Temple was slain and by an antagonist, and that antagonist John Rhodes, is absolutely certain, for his dead body was found, and Rhodes admits that he slew him; and in his confessions which are in evidence by the testimony of Peter J. Babcock and Peter S. Blake respectively, he claims that, he did the act in self-defense and states, in substance that he met Temple on the night of the 21st of April last near the end of the causeway leading out of Wilmington to this place, and near the forks of the road, as he was returning to the city from an escort of the witness, Lucinda Duckery, towards her home; that he saw Temple approaching on the opposite side of the way and drew his hat over his forehead, or eyes, to avoid being recognized by him; that Temple, however, saw him and advanced towards him across the road with language as follows: You son of a bitch I've got you now, and I intend to kill you, or similar words, at the same time placing his hand upon his inside breast pocket; that he, Rhodes, started to run away from him, and in so doing struck a *Page 500 
stone, or slag, or cinder, with his foot; that he picked it up, and turning upon Temple struck him with it and felled him to the ground; that he then started again to run away, but came back and saw something shining in Temple's hand, or on the ground (and it is not exactly certain which he said) which was a knife, and that with it he cut the throat of the deceased. The physician, Dr. Ogle, who was called by the coroner to examine Temple's body, describes the wounds given by Rhodes, first, that by the slag (for I suppose we may treat the piece of slag before you as being the first weapon used) which consisted of a wound upon the head, about three or four inches above the left ear, of the length of about one and a half inches, a breadth of about one inch, with a ragged edge, and deep enough to reach the skull, the outer plate of which was broken so much that the fracture could be felt by his finger very distinctly; second, that by the knife, which was a horrible gash extending from ear to ear under the jaws, with one stroke partly on the left jaw, and severing the neck, with the muscles, arteries and windpipe, back to the verterbræ, or spinal column, a wound, which Dr. Ogle informed you, appeared to have been made by several strokes of a knife, and which the prisoner himself stated to Blake, according to his testimony, required three or four such strokes; and Babcock states that the prisoner admitted in his presence that they were given with the Barlow knife in proof before you. As confirmatory proof of that, the life blood of Temple yet stains the blade.
Now, gentlemen you have the facts of the killing and from the mouth of the prisoner; and we say to you, that if they cannot be considered by you as consistent with the theory of self-defense, then they are the evidences of one of the most malignant and diabolical crimes that has ever occurred in this State. Now, what made it necessary, taking the confessions of this unfortunate prisoner to be true, that he should assail James Temple at all? With the means of escape at hand — the open, unobstructed, *Page 501 
wide road, and the adjoining fields — was there any imminent and manifest danger to the life or limb of Rhodes? It was night, and the eyesight of Temple bad; besides, when Rhodes saw him he was on the other side of this wide road, and, it may be supposed, not very close to him, for, unless the night was very cloudy, there was light enough to see at a distance, where the eyesight was good; the moon being in her first quarter, and, at that time, two or three hours high. He must have been at least 40 or 50 feet away when seen by Rhodes. If Rhodes, therefore, had reason to fear the designs of Temple, (which, witnesses have sworn to you, were deadly, and known to Rhodes,) why did he not, instead of contenting himself with pulling his hat over his eyes, to avoid discovery, take himself out of the way, as he might very well have done? Why run the risk of an encounter with such a powerful man as Temple is shown to have been, if he could have avoided it? Still, he is not to be deprived of his plea on that account alone; for he had the privilege of the highway, as well as all others; and according to the statement of the woman, Lucinda Duckery, supposed Temple to be at her father's house. We think it but just to him to say that we have no thought that he meditated the murder of Temple when he separated from his former mistress that night. But, whether this be true or not, he is none the less guilty of murder in the first degree, if his plea of self-defense should fail him. Let us look a little more at that, in the light of the law. A man may defend himself against an assailant where he cannot escape him; but he cannot do it as he pleases. For example, if one be assailed with the fist, he cannot defend with a club, or deadly weapon, because the defense is altogether disproportionate to the offense; and if, in such defense, death ensues, the law implies malice, from the character of the weapon used, and the party is guilty of murder. So, if a party assailed has escaped from his assailant, and then returns to him, and attacks and kills him he becomes the aggressor, and is guilty of murder, from the malice displayed. For malice, *Page 502 
let me say to you, gentlemen, means that general malignity which proceeds from a heart void of a just sense of social duty, and fatally bent on mischief, and whenever the fatal act is committed, deliberately, or without adequate provocation, the law presumes it was done with malice, and in such case it behooves the prisoner to show from evidence, or by inference from the circumstances of the case, that the offense does not amount to murder. Express malice is proved by evidence of a deliberate formed design to kill another, which may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon knowing it to be such, a previous grudge, c. So also if one should, in self-defense strictly, overcome his assailant so that he might, escape from him without difficulty, but should, after having started away from him, return and take his life by the use of a deadly weapon, and especially if he should, in giving an account of such, his transaction state, as his motive for returning, that his assailant had tried to take his life, and he, the party accused, had the same right to take his. In all these hypothetical cases, gentlemen, the party would be, in law, as much of a murderer with malice aforethought, and therefore guilty of murder in the first degree by our law, as if he had deliberately given poison to his adversary or had laid in wait for him and shot him. For the character of the alleged resistance would stamp it as not having been made in good faith, and with the honest intent to avoid the violence of the assault. And further, gentlemen, the conduct of a party who kills another in self-defense, in good faith, is usually, though not always, open and frank; in fact he seeks to make known what he has been compelled to do, and be justified by his fellow-men. In this case, however, it appears that the prisoner fled from the dreadful scene across the fields, reaching his mother's house by a circuitous route — for the prints in the soft earth of the meadow correspond exactly, as a witness swore to you, with his shoes; and afterwards whilst under arrest at the Town Hall, of Wilmington, he *Page 503 
stoutly denied for some time that he knew anything about the killing, and alleged he could prove himself to have been at that time elsewhere — at Hedgeville — more than a mile distant: and this too, to a friend who sympathized with and believed him. These circumstances do not seem consistent with innocent slaying; but still they are not conclusive against it; for men in the terror succeeding the doing of a fatal deed (however innocently) are sometimes betrayed into expressions, or conduct, implying guilt. It is possible that the acts and conduct of the prisoner are consistent with innocence, but barely so under the most favorable circumstances. And referring to the means of self-defense, we say to you that the law does not demand of the accused the same deliberate judgment in defending himself which the jury can exercise in reviewing the circumstances of the killing; but only that, he should have actually and reasonably believed that the only way to protect himself from immediate danger was to kill his adversary. But this must be a reasonable belief, and the jury are to judge whether it were reasonable or not.
Now, gentlemen, let us consider some other things, or proofs, in this case. It is in evidence before you that a very bad state of feeling existed between the prisoner and the deceased, growing out of their relations to each other with respect to the woman Duckery; and that Temple carried a pistol habitually and threatened at various times to shoot Rhodes with it, of which threats Rhodes had knowledge. Whether the latter was in much dread of him on that account, you can only judge from the testimony, and that is for you alone to pass upon. We will not express any opinion upon that point, but we will say this much, that if one for whom another carries a pistol and who is threatened with its use upon himself, kills his adversary, who is in the act of drawing it upon him, instantly, where he had no other probable means of protecting himself, it is no murder, but self-defense. But it devolves upon him to prove, from the circumstances, that *Page 504 
he could not get out of the way, or could not protect himself in any other way than by killing; or such killing, if intentional, will be murder, being characterized by that evil disposition which is itself malice.
And, also, it must be said to you, as something for this wretched man, that the law presumes every man to be innocent until he is found to be guilty, and that proof is upon the accuser, in this case, the State. And you should also give full consideration to the fact that Rhodes is found to be a man of peaceable, orderly character and to be so known and considered by his friends and neighbors.
Take his case into your hands, gentlemen. If, after you have fairly and conscientiously examined it, (always inclining, as you should do so far as the evidence will allow, to the side of innocence,) you should have a well-founded reasonable doubt that the prisoner exceeded the bounds of self-defense as we have shown you the law concerning it, you should give him the benefit of that doubt, and acquit him, otherwise you should convict him of murder in the first degree. And, also, if from what we have said, and what you have heard from the mouths of the witnesses, you should conscientiously believe that the prisoner is not guilty of murder in the first degree, and yet not innocent entirely, you may convict him of murder in the second degree, or of manslaughter.
After the jury had been in their room an hour and a half in deliberation on their verdict they requested further instructions from the Court upon points of law suggested in a written communication from them, and on returning to their seats in the Court room were further instructed by the Chief Justice as follows: Gentlemen: — We have received two communications from you asking for instructions upon points of law, and we have sent for you in order to give you such instructions upon those points as may appear necessary and proper. The first question you ask is, "What length of time before committing a murder is necessary to constitute it a case of premeditation? *Page 505 
Now upon this we have to say to you that in a case of attack made or attempted by one man on another, the attack may be repelled by that other; but he must use such means only as are necessary, and then only when he has no probable means of escape from his assailant. But if he exceed the means in such manner as to evince an evil disposition, and killing ensue, and such killing were not necessary for his protection at the time, this would be such an act as denotes a purpose or design of taking life, and would constitute the offense a murder. There must, in such case, have been premeditation, though but for a short time, and the law fixes no measure to the time. The intent to take life may arise without much reflection; in fact, with but very little.
The second question which you have submitted to us is, "Can a person who kills another in the heat of passion, be convicted of murder in the first degree?"
To that question we will say that where a person, in a heat of passion, upon such provocation at the time as would create in most minds a very high state of excitement, kills another as the result of such heat merely, and not of prior hatred or ill-will, the offense is not murder, but manslaughter.
 Verdict — "Guilty." *Page 506